Could the attorneys presenting argument please approach and introduce yourselves for the record? Kate Fatton on behalf of MyPillowInc. Could you say your last name again? Fatton, N-A-T-T-L-A. Thank you. Good morning, Your Honor. Stephen Diamon on behalf of Schad, Diamon & Shedden P.C. Mr. Diamon, good morning to both of you. We're going to allocate 15 minutes per side. I would imagine the appellant would like a little bit of time for rebuttal. Yes, Your Honor. That would be fine. We can be a little flexible with the time too. And with that, I guess we're ready to proceed. Thank you. May it please the Court. Kate Fatton on behalf of the appellant, MyPillow. This isn't the first time we have an appeal on false claims act litigation filed by the Diamon firm. The firm has filed over 900 cases claiming that retailers aren't paying taxes on their internet sales. In this case, MyPillow is a small startup company founded by Mr. Lindell, who invested his entire life savings to pursue his idea and even sewed his first pillows by hand along with the help of his family. MyPillow, like many startups, may have made some innocent mistakes along the way, but the company never showed reckless disregard for its tax obligations. Yet it finds itself embroiled in years of litigation and faced with trouble, damages, and trumped-up attorney's fees. Well, isn't this a bench trial, and didn't the court enter findings that it's concluded there was a reckless disregard? And aren't we reviewing that for manifest waste? There are two issues when we talk about the Santa issue. What you're saying is correct if we're talking about the mixed question of facts and law about whether or not MyPillow acted with reckless disregard. But why is it a mixed question of facts and law right now? Why is it a mixed question? Yeah, this is a bench trial. The judge made a determination regarding whether there was evidence of Santa. Why is that not manifest waste, plain and simple, straight out? Well, there's another aspect of reckless disregard based on the appellate court's holding in the Rick's Camera case. Sure. Yes, this is a nebulous area of the law, and you can't possibly possess Santa in those circumstances, absence in showing. Sure, but didn't the judge determine the circumstances here, show that's Santa? He did, but I think he ignored this court's ruling in Rick's Camera in doing so. Questioning whether this is some kind of mixed question for us. I would have called it just a manifest waste. And I agree with you that the cases say that there's some nuances regarding what this reckless disregard means. But I think there's enough there that a judge hearing the case then decides whether the facts support that. I disagree to the extent where we're talking about whether you can have Santa in Nexus. And I think another issue in this case is the computation of damages and attorney's fees. And there I think particularly the question of whether the diamond firm can recover fees on behalf of itself is a question of law. So I think that there is. Yes, I agree with you with that. I do. I think the question of whether attorney's fees are allowed in this particular instance is a question of law for this court to review. Do not vote. Thank you. So we talked a bit about what I think the appellate court was clear in the case of Rick's Camera that Nexus, which is whether or not the company has enough connection with the state to require it to collect tax, is a nebulous area. The court said it best. And the court declined in the Rick's Camera case to dismiss all of those complaints because it had one concern. And that concern was, well, was there evidence that these companies in fact sought advice? Had they heard from advisors telling them, you know, to collect the tax? Well, does the fact that he did remit the tax for the craft shows? Doesn't that show some knowledge that he owes a tax? Well, he certainly did. The craft shows, what the record will show is that, you know, there's people at the craft shows that you fill out forms and you submit the tax at the shows. And there are, you know, the Internet really changed things in terms of. So many. So many things. Not just the field of sales tax, but, you know, very sophisticated companies that are making sales into the state, big companies with tax departments that are collecting the tax. So there's a question of the amount of physical presence that's needed in the state in order to require an obligation. Are you contesting that seriously, the physical presence? No, I'm not. I'm not. I didn't think so. I'm not, Your Honor. I think that here we did have what the trade shows, the presence in the state. I think that. Just the fact that as soon as Shed Diamond files their claim, MyPillow immediately remits the prior tax years. Doesn't that indicate some knowledge on their part that they owe the tax? I think MyPillow, the record will show, MyPillow, it was a company that at the time of trial hadn't recorded a profit. They were deeply concerned about having this liability. They looked at the issue of, you know, more seriously, clearly than they had in the past and decided that the safest thing was to go back to their customers. I think that shows how careful MyPillow was. Isn't that exactly why you lost a trial on this? Because the trial court said that before that time, before the lawsuit was filed and it was put right in your face that you didn't do enough. It's not a question, in other words, of how complicated the law of substantial nexus is. It's did you try to figure it out? We have these other cases like National Business Furniture, Relax the Bags, cases where the defendant won on this issue because they showed that they had hired experts and that they had, in one case, they had actually gone state by state to see where they had liability and where they didn't. In other words, they made good faith, honest decisions that may have been wrong, but they were in good faith. And the way I read the trial court here, the trial court was saying MyPillow didn't do that. It's not as if they, you know, sat there and thought about it for a long time and said, this is our best judgment. They sort of just blew the whole thing off. Isn't that what the trial court said? I certainly think that the trial court really pointed to that this company, you know, made the investments in doing an infomercial as opposed to finding out what their tax obligations were. But I would submit they didn't necessarily have a business yet. It was a startup company, and I think we should take into account the sophistication of the taxpayer. Do the cases suggest that maybe the starting point is always checking out whether you do owe taxes and not basing it on, you know, your own knowledge, but maybe talking to an expert? Wouldn't that kind of always kind of take you out of the reckless disregard area? I think what you're suggesting would, but I think that the reckless disregard is gross negligence plus. I don't think there's an affirmative duty. They describe it as, you know, fax it right in front of you and you turn your head away so as not to see them. So I think clearly if you have, if this individual had done more, he would find himself outside reckless disregard. I don't think that's the case. I don't think the issue of sales tax was clearly in front of my pillow when they started advertising online, you know, on television and getting sales from all around the country, including Illinois. You don't think the issue of whether they owed sales taxes was right in front of them? Well, I think that they had some information. He did talk to somebody casually about his obligations. Well, is casually enough for a company selling all over the country? It's a company that just started doing business, a very small company. And I think that it talked to, you know, it's just on a very small level, talked to his friend who was a CPA who said, you know, if you don't have physical presence here in Minnesota, you don't have to collect taxes. But wouldn't everybody say, I had no idea, I owed it, and isn't that why the penalties on this are so significant? That's why it's travel damages. Because everybody would say, oh, gosh, I had no idea I owed it. Here it is. I paid it all up. Don't worry about it. We're all square now. Wouldn't everyone say that? I would say that if I could get away with it. No, we do have an Illinois Department of Revenue that is in charge of administering the taxes. The Illinois False Claims Act is an anti-fraud statute. It's supposed to reward someone with inside information to bring forward that information. And this case doesn't further that purpose. Wasn't the My Pillow Company, though, immediately present in Illinois? Like, weren't they selling these pillows at the trade shows from the get-go? It was over time. Their presence in the state increased. But before all this erupted, weren't they already physically present here at trade shows? They were present at trade shows. And there's a case in Florida that says, you know, trade shows is not enough. So, you know, the question of nexus is a constitutional question. So looking at Illinois isn't enough, you know. So having these appearances at multiple trade shows you say is suggestive of not a nexus, not enough? No. What I'm saying is that, you know, there's varying degrees of nexus. And there is a case in Florida that I cite in my brief share where trade shows wasn't enough. There's a continuum that, you know. This happened after the Internet explosion, right? Yes. The taxes were due or the claim was filed after it was apparent that there was not only the trade shows but an explosion over the Internet where MyPillow was actively selling all over, including Illinois. Yes. Okay. But then the counter to that is that there was really no effort to really determine tax liability. When, you know, I mean it's kind of basic for everybody doing business that if you're going to be selling products in other states, you know, you're going to have to tax those individuals purchasing from you to meet your tax obligations. I don't think that is a basic premise. I think clearly if you're selling something to the state, you're present in the state, you're going to know that you have to collect a state tax. I think the Internet injected confusion in this area. And we have, like I said, very sophisticated companies that aren't collecting tax because they don't feel that they have a sufficient nexus. This is a very unsophisticated company just sort of starting up their business. But they didn't reach the conclusion that they didn't have a sufficient nexus. They didn't consider it one way or the other. Isn't that what the trial judge said? Isn't that the whole key here? No, I think the record shows that he did, in fact, consider it and asked a CPA who told him that you only need to collect the tax where the company is headquartered. And did the trial judge believe that testimony? Did he say that was credible testimony? I don't think he – I could be incorrect there. I don't think he said that it wasn't credible. He certainly said that he didn't have specific details about it. Do you want to talk about fees? Yes, I definitely want to talk about fees. So I think just to – I'll turn right to fees, but then there's another issue I do want to make sure I save some time for on the troubled damages. I think the big error here was the circuit court awarded Mr. Diamond's firm attorney's fees for representing itself in the action. There's a variety of contexts the Illinois courts have rejected claims for legal fees that were brought by organizations. Despite the related representations to the contrary, courts have looked both ways on this issue. They have looked at the Supreme Court case in Kay and a footnote in Kay to suggest that a possibility that organizations could, in fact – I think the better interpretation and one that I encourage this court to adopt is that by the Michigan Supreme Court in the Frazier case. And they basically said, well, Kay was really specific to Section 1998 and concerns of Congress wanting to make sure that pro bono and certain unspecified organizations were able to collect fees in the 1988 context. Is there a split in the circuits regarding whether or not a pro se attorney is not entitled to fees? There certainly is – I don't know if there's a split. It would go so far as to say there's a split in the – Federal circuit. Federal circuit. What the federal circuits have said is Kay doesn't preclude that. Kay, I think that – there was one court that said uniformly Kay doesn't mean that you can't ever award attorney's fees. Okay, so are they basically all saying you can? I don't think so. Well, that's why I asked you. Is there a split? Are you saying you can't since I'm saying you can? The cases we've located have been in the state courts. And here in Illinois, in the context of the FOIA, what the cases really look at is whether or not a law firm has a separate identity from the attorney. And here, Relator made no effort to distinguish itself from the lawyers representing its firm. Which case is that? Where are you taking that from? What court decision? That's all the cases that Relator cites, the federal cases as well as the Frazier. I thought you were talking about Illinois law just now. Oh, yeah, the Illinois courts have looked to whether or not there are certain FOIA cases. I submitted supplemental authority where I listed those cases in the FOIA context. And that's where they look, where there's a separate identity for the firm. And here, the facts show that Mr. Diamond and his associates bought the pillows, went to the trade shows, conducted the investigation. Then they put their firm name on all of the pleadings. That's something that they looked at in Frazier. They testified at trial in the case. The associates that were involved in the investigation and Mr. Diamond testified at trial. They're now here sort of defending the same attorneys, you know, defending this on appeal. There's really nothing in the record to suggest that they enjoyed separate identities. And I think it's really critical here in the context of a False Claims Act as a matter of public policy. What are the three prongs that the U.S. Supreme Court gave us in Kay to suggest why the fees shouldn't be allowed in that case? The three prongs? Aren't there, like, three reasons they gave? There were three different reasons. There were. There are three prongs. I don't have them listed here, but I do think that there should be an agency relationship and a separate identity. Okay. And an attorney-client relationship. Yeah. What else? They had a couple of other reasons about that individuals should get an attorney as opposed to representing themselves, the public policy behind that. Wasn't that one of the reasons? Yeah. And then what was the third? It had something to do with unscrupulous attorneys? Abuses. Abuses. What? Do you remember? Yeah, just, you know, the old adage of being a fool. Well, I don't know. There were really, I think, three kind of different lines of reasoning that Kay had when it, you know, issued that opinion. All right. Well, anyway. So I think it's here in the context of whistleblower cases where they're already getting 30 percent. The federal circuits have said that Kay, the U.S. Supreme Court case, was concerned with incentivizing people to get a lawyer so that they could both weed out bad cases and properly prosecute good cases. And what the federal circuit courts have said is a law firm that uses its own lawyers, they do have a lawyer to do that. They're not representing themselves in that sense. They have a lawyer to prosecute the case. That person may work for them, but it's still a separate lawyer. And so allowing a law firm to collect fees from its members is not inconsistent with Kay. Why would you say that that's wrong? Because I think in the cases that we have in the federal court, there were separate identities between the law firm and the lawyers that were representing it in the case. And I don't see that. What does that mean? That means it's the same folks that, you know, one of the cases had to do with sexual harassment and a claim under Title VII. It's not the same people that – Well, who's the client here? In this case? Yeah. Isn't that one of the concerns of Kay? There is no attorney-client relationship at its base. Who's the client that's going to have to pay fees? Who's the – I mean, that's assisting you, okay? There's no client here. No, it's just Mr. Diamond and his assistants. Yeah, and isn't that part of what our Illinois Supreme Court said that they were going to go along with that idea that there has to be an attorney-client relationship in order to allow for attorney fees and that in the FOIA case there was no attorney-client relationship? Right. So is that the be-all and end-all, though, of the examination? I think it's that and sort of the separate identity. I think it's really have you incurred any fees is what you're going to, and then the separate legal identity here. And here we don't have – the relator didn't maintain a separate identity throughout. They're all the same. Is there a suggestion also that this is a double recovery? Absolutely. Absolutely. Yes, I think you do in the context because none of these cases, none of the cases that Mr. Diamond cites or me are a Federal False Claims Act case or a State False Claims Act case. I think in that context it's particularly important. The relator receives 30%. I think, and we're going back to the public policy, if you allow a relator law firm to serve as counsel for itself in False Claims Act cases, I think that there's a chance that that would encourage them to incur unnecessary fees and bring motions, unnecessary motions in court because it's in their own interest to do so. In the cases where they're arguing with somebody for FOIA or trying to collect their fees, you know, there's less of that tendency than there is here, and I think we saw that in this case. And I think that's – Do you want to briefly touch on your treble damages? You said you wanted to mention treble damages. Yes. Yes, thank you. So the other critical mistake that I think that the circuit court made was this issue of treble damages. Clearly, the disregarded anchor mortgage, which is a Seventh Circuit case, and what we talked about earlier, those taxes that were paid before the trial, so the State would get those at any event, whether they succeeded at trial or not, should not have been – none of those taxes should not have been trebled. It should have been – they should have been excluded before the trebling, and that's just, you know, another $200,000 that was – But these weren't gratuitous payments. These were payments that the trial court found were specifically in response to the lawsuit filed by Relator, the proceeds of his efforts. Isn't that what the trial court found? Well, he said that they're proceeds, but I think that's – the question is, what are the damages that the State suffered? So I think whether or not they were proceeds, that's irrelevant to the issue. What are the damages the State suffered? They would have gotten that anyway. So does the timing of when you pay matter at all? I don't think so. I think we paid them before we had the liability to do so. So let's say you went to a full-blown evidentiary hearing, and once it was concluded, all the lawyers for my bill got together and said, you know what, we're going to lose – we're going to lose this case, so let's go ahead and pay right now before the judge has a chance to treble it. And then you'd be standing here saying, it doesn't matter when you pay. You could have paid one minute before the final judgment. You paid it in advance, no treble damage. And couldn't you defeat the whole purpose of this? Well, I would rather be here today saying that they paid it in advance of the trial and the facts that they need to submit, but I don't think it does. I think until they – before they had the liability. And here in the tax context, you can amend your returns. People always make mistakes on their returns. You can amend your returns for three and a half years. That's what they did, and there's a procedure in place. It's not that they just, you know, mailed a check to somebody to try to pay off their damages. And I think it's pretty universal to be able to mitigate your damages. And that's – when the judge rules in following anchor in the first decision, that's what he said before he reversed himself. Do you want to save some time for the public comment? Yes, thank you. Mr. Diamond. Thank you. I may lose the court. The circuit court's finding on the issue of reckless disregard is subject to the manifest way. And the only argument I want to make is that his findings there are entirely consistent with post-briefing decisions in this court in the national business furniture and relax the back cases. Because there they said the proof of reckless disregard is an Austen-type situation where an individual bares his head in the sand and avoids making simple inquiries which would have alerted him to the fact that he was making a false claim. And isn't recklessness generally a factual question? Yes, it is. Yes, absolutely. And the thing here with the proof is overwhelming. They never made any investigation themselves. They never looked at the Use Tax Act, even the basic Use Tax Act provisions that says you maintain a place of business in Illinois. And this was a company that had started coming to the trade shows before we started the Internet sales. In the very first year, they were, I think, 25 days in 2010. Then it rocketed to 70 days in 2011, 2012. They were here 100 days collecting tax on all the sales. They never once looked into the obligation on their Internet sales tax collection. It was just a complete failure. They never asked IDOR what they should do. They were never audited by IDOR. So is the Use Tax, is there, would you say that there is some difference in the states in the union whether or not there is the requirement that was obviously present here? I don't think there is. So it's uniformly been interpreted. Yes, yes, I believe so. And then just to top it off, in July of 2012, they registered, formally registered and filed a Reg 1 with the Department of Revenue. And that Reg 1 is attached to our appendix right in our brief on pages 5 and 6. And in there, they have to say, well, what is your business? And they say, well, our business is, we're selling aircraft and trade shows. And then there's a number of specific additional questions that would alert them to other tax obligations they would have. Like, are you selling vehicles? Are you selling tires? Things like that. And there's one question that says, are you making sales from out of state to Illinois? And they marked it with an X. So when they registered, it told them, this is something you have to be looking at. Instead, they start filing their ST1s. And when it comes to that section where it says, list your sales from out of state, just left it blank. Just left it blank. From July of 2012, they were sued and they were sued with a complaint in March of 2013. It was November of 2013 before they even started to collect and remit sales tax on out-of-state sales. So all of the evidence here supports Judge Mulroy's finding on reckless disregard. Now, on the question of the damages, it was actually, although the lawyer had argued this before to Judge Mulroy, it was actually the state of Illinois who filed a motion to reconsider in October of 2015 in which they said, wait a minute, this idea of giving them credit for the taxes that they paid anywhere from ten to three years after they were supposed to do before traveling doesn't make any sense. So you're saying the Attorney General intervened after the finding on the bench trial? Yes. Well, because wouldn't that take the teeth out of the traveling provision? I'm sorry? If you give them a credit prior to traveling, what are you traveling? You're traveling zero times zero. So doesn't the traveling provision, isn't that the teeth in that statute? It is. And that's what the state of Illinois said because they filed a motion with the judge in October of 2015 saying, wait a minute, it's a mistake to give them credit before traveling. Otherwise, as I believe your Honor said, you can pay the day before the judgment is entered. In fact, the payments for 2012 never made any back payments for 2011 and 2010. But the back payments for 2011 were made the week before the trial in 2014, which highlights exactly how the bipolar is trying to get around the traveling provision. And then Judge Mulroy finally issued an opinion in which he stated, and I believe it's November 25th of 2015, in which he said, I'm treating this as a motion to reconsider by the state and I'm granting it. And I'm saying the traveling is after, I'm sorry, the credit is after the traveling. So what did Judge Mulroy say about Hamer in giving the, awarding the fees in this case? Yeah, okay. So I think that's, he said a couple of things that are very important. First of all, the basic question. He adopted the K rationale and said the relator here is not proceeding pro se. Under K, it's appropriate to issue fees. The fees under the fee shifting staff to have been earned because the state of Illinois specifically declined to intervene in the case and chose and authorized the relator to proceed in this action on behalf of the state. Mr. Knight, what percentage of relators are lawyers or law firms as opposed to just a pro se? Would you know? I know that that's part of your practice. Right. Is it usual? There's a few lawyers who do this work. And how often would you get a lay person as a relator? Well, in most other cases, it is a lay person. Okay, so it does happen. It's not just lawyers who are. No, okay. No, not at all. But Judge Mulroy made an additional, I think, very important statement here. He said not only is the relator entitled to fees under the fee shifting statute and under the K decision, which has been applied by every federal circuit court, every circuit court of appeals consistently. We've cited five circuits that have said that. None have said that a relator, oh, I'm sorry. None of which are only binding on us, though, are they? I'm sorry? None of those decisions. Absolutely not. But Judge Mulroy made another very important decision. And he said the relator here was also representing the state of Illinois. And he, the relator, did all of the legal work on behalf of the state of Illinois, and the state of Illinois is going to benefit enormously from this case. So is that how you would distinguish the Hamer case? Well, and another reason, I think, that distinguishes Hamer. Because Hamer, the law was pro se. It was not a separate law firm as it is here. But more importantly, in Hamer, they were concerned about abusive fee practices and a lawyer having a client, you know. But doesn't the statute. I'm sorry, Ron. Doesn't the statute allow you as a relator to do what you did, file your complaint? And doesn't the statute also allow the state to intervene if they choose? And so can you really, even though Judge Mulroy said you're representing the state, isn't that really not actually accurate? Well, it is accurate because he cited our Supreme Court's decision in Spicitti v. UPS. And when you go back and look at the Spicitti decision, in upholding the constitutionality of the False Claims Act, the Supreme Court said what is important here is the relator conducts the action, but the attorney general controls it. And the control here is when the suit is first filed, the state can intervene if they want to. Or they can dismiss it. Let me ask you. Yes. Let's say you're representing the state. Yes. Then doesn't the statute provide for where you're actually involved with the state? The state takes a percentage and the relator takes a percentage. In this case, there was no division, was there? Oh, yes. The state's going to get 70% of the recovery. No, I'm talking about in terms of your actual 30%. Right. I mean, are you saying that if there was a case where the AG is with you and intervenes or, yeah, intervenes, then the percentage would be 15% to 25%. Sure. No interventions 25% to 30%. Are you really representing the state because you are taking the 30% in this case? Absolutely. Because following up on Spatini said, look, the state can come in at any time. The state can sell the case. Did they have them here? No. The state can move to dismiss the case. No. The state wanted the relator to go ahead. They wanted us to do four or five years of legal work in this case to look at the method. I'm sorry. I'm sorry. And finally, the state could have intervened at any point and said, we want to take over this case. But, no, the state was perfectly willing to let us put all of this legal work into this case successfully and reap the reward. Under our Hamer case, the court's concern, one of the court's concerns, and I think even in the Kaye case, that the granting of attorney fees would be a double recovery. What do you say to that? Well, it's not a double recovery, you know, because the relator's share is just a fraction of what the legal fee. The legal, we had put five years of work in it. We would have an enormous loss in this case because the legal fees that Judge Malloy reviewed and approved are substantially more than the relator's recovery. So he found we were right. Would that have been a loss? Would that have been a loss? Yes. Are you really, as a matter of law, incurring legal fees here? Well, if you had an outside counsel. Well, okay, if you had. . . Sure. Pick a firm. Sidley and Austin. You were paying them $400 an hour for five years. Yeah. You'd have a big bill, and they'd be saying, I want you to pay. Yes, they would. But these are your employees, right? Yes, but I was paying. . . But as the, as the, as Judge, Justice Lavin said in the Uptown case, we're a litigating organization. We stand to make profit from this case, and our lawyers are going to receive more money as a result of our recovery in this case. But does that case help your position? Yes, I think it does very much because he found we were acting, that under that case, we were not acting pro se. We were falling in pay. But then he said, I don't think the policy reasons would be served here by permitting Uptown to get legal fees because they're going against the state of Illinois. It can be abusive, and there's no benefit, right? Who's your client? The client is the law firm of Shad Diamond and Shed, and that is correct. And who are you? And I'm one of the lawyers who works for that law firm, and we provide legal services to that law firm. But the Uptown case gave a whole hassle of reasons why there was a threat here, because the unlimited FOIA litigation against the state of Illinois. This is the reverse of that. The state of Illinois authorized us to go forward. But didn't Uptown hold that a litigating organization, a company that has lawyers within it, cannot collect attorney's fees? Well, he said no. Justice Lavin said, you look at the policy reasons here, and we don't think they would be served because of the possibility of untrammeled legal fees and because there would be no benefit to the lawyers from the salary lawyers from a recovery here. And we don't want to have this kind of untrammeled litigation going on against the state. Are your lawyers salary lawyers? They receive a salary, and they receive a share of the profits of the base salary, and then they receive more money depending exactly on the results of our cases. So they stand to benefit. All of us do. If there was a ruling saying that you can't represent yourself on recovery attorney's fees, would that have a quelling effect on key time actions? It would have. Because these cases are filed, you have no idea what the tax liability would be. It's a complete crapshoot as to what it is. So if you're going to be limited to your share, and you knew you would not have any right to attorney's fees, you'd just have to be guessing. But then you could hire outside counsel, right? Well, but then you'd have an even greater obligation. And the point still is it's the state who encouraged us to go forward here. It's not like the Uptown case. Wait a minute. What do you mean the state encouraged you to go forward? I thought you initiated, and then what do you mean? Well, because then the state declined to intervene, and they said we ought, and they went to Judge Malloy, and they said, Judge Malloy, we want you to enter an order authorizing the relator to proceed with this action. Didn't they have to do that in every case? Didn't they do it in all your other cases where they said they were either in or out? Well, in some they intervened, in some they didn't, in some they didn't. A lot they dismissed. Sure. I understand, but I'm not sure I understood when you said they, you know. Well, that is, but the point is the order they have entered says the relator is representing the state of Illinois in this case. That's what they have done. And, again, it's totally dissimilar, Your Honor, from the Uptown case, because when you read Scachetti and you look at Uptown, it's a different situation. The state controls it, and the state is going to benefit from it. It's not a lawsuit against the state. It's one they want us to go forward to. That's the Fourth District case you're talking about. Which? Scachetti. No, no, Scachetti is the Illinois Supreme Court decision. Oh, all right, because this other name is very similar. Yeah, no, Scachetti is. Versus Madigan. I would have said it was she. I would have said whatever you think. It's Scachetti, S-C-A-C-H-I-T-T-I versus U-B-S. All right.  And it says the litigation is conducted by the relator but is controlled by the Attorney General. And they said, furthermore, that the work of the relator supplements the work of the Attorney General, and that's why it's a good thing. And that's why, then, under the statute and under the orders in this court and under Scachetti, the relator here proceeded on behalf of the state. And I think that's a very major difference between this case and Uptown and the Hammer v. Lenz case. Because Hammer, again, said we're not going to allow lawyers up close to the lawyer, but Hammer said we're not going to allow somebody to just bill up fees against the state of Illinois. A lawyer, he's acting, he's a fool, you know. Well, we're not going to be fools here because we have the state, and the state has stepped into a lot of our cases at various times to settle them, to dismiss them. So they always have the control. The kind of abuses that Hammer v. Lenz was concerned about are not the abuses here. And it's only the relator's five years of hard work that brought this case to a successful conclusion. But Uptown grieves Hammer for the proposition that an organization that uses in-house lawyers, salaried lawyers, does not incur attorney's fees in the first place. Now, Uptown was a nonprofit. Yes. Other than that, how is it different? Because he was very careful, Justice Slammer, very careful to say we don't think in the facts of this case that it would be appropriate to provide legal fees. He doesn't articulate a general principle that a litigating organization like Chad Diamond and Shedden shouldn't get fees. He said, under the facts of this case, we don't think it's appropriate. And I'm arguing to this court that the facts here are entirely different because of the statute and whatever. I tried one other case, too. The defendant cited the Verani case. And the Verani case was an FCA case. And there the court said, look, if a litigating organization is entitled to get its fees, that's what they should do. And that's what Chad Diamond and Shedden was here, a litigating organization. We were not bringing a suit against the state. We were bringing a suit controlled by the state for the benefit of the state. But Verani was about a fight between the litigating organization and the lawyers. And in this case, the litigating organization and the lawyers are one and the same, right? Well, there's a – we're not pro se, Your Honor. We're separate. And that is what the Kaye case has always held and has always been applied by the state. I'm sorry. Are you aware – I didn't see any cases cited. I don't think any of us did. And I didn't think it from either side. Is there a case on this issue under any False Claims Act that you're aware of? No. Okay. No. Okay. That is correct. And that is why the Verani case is the closest to it because it says the litigating organization is entitled to get its fees. Okay. Thank you very much. Okay, Mr. Diamond. Thank you very much. Ms. Batten? I just have a couple more points, unless you have other questions, then I'm done. First of all, the relator has asked you to read into the fact that the state did not intervene as the state – him acting on behalf of the state, litigating on behalf of the state, the state encouraging him to litigate. In fact, you can't make such a leap here. I mean, this relator has filed over 900 False Claims Act cases. Our state simply can't keep up with that. They have declined to intervene. There was a point where they intervened in the beginning of all the cases, then they stopped intervening. Intervening in all cases and only in special circumstances do they intervene. So I don't – Why should they? They've got someone else who will do the work and they get 70 percent. That's one way of looking at it. Well, isn't that one way that they might be looking at it? Well, that may be how the AG's office is looking at it, but certainly the Illinois Department of Revenue has been extremely critical of Mr. Diamond's firm in the past. Was that Mr. Hamer? It isn't currently Mr. Hamer. Mr. Hamer was there – So you mean in the past? Yes, that was a couple – Yeah, it's been a while. A couple of dark years ago. But, yes, they have been certainly critical because they feel that it really undermines their tax enforcement abilities. You asked the question, Justice Burke, whether – how often does this happen? We couldn't find one case in the federal contracts where the – was also the attorney firm. Mr. Diamond clearly started a trend in state False Claims Act cases, and I think we've seen that more often. Clearly, he has on 900 different occasions. But I don't think this is what we want to encourage in our state to have – Are all of those here in Illinois? Were they all here filed in Illinois? Yes. And I don't think that's the type of litigation – I think that this really was designed where you have an insider with inside information. It wasn't just somebody who could go out shopping on the Internet and they go, here's your tax-collected file suit, and figure out the facts later. Do you have any information about the success of all – of the 900? And were there attorney fees awarded in any of them? I do. A B&A – a – sorry – a writer for B&A wrote an article last year, and he did a FOIA request of the state, and a lot of the cases were settled. They were low-dollar cases. It had to do with the second set of cases that were later filed. And what the reporter uncovered was that – this was 2016. The way it just dealt with the settlements was that the leader had recovered close to $5 million from his portion of the relator's fees, and then another – another close to $6 million. I believe it was $5.7 million in – I'm sorry, it's the other way around – $5.9 million in attorney's fees, $5.7 million in relator's fees, just on the settlements. The other stuff, you know, had – that doesn't include cases where there's been a judgment. What do you think about Justice Burke's question about the chilling effect? If we ruled the way you'd like us to rule on this, would there be a chilling effect? I mean, not all of these cases are huge money cases, right? There's – there's small false claims cases.  I would hope that it would have – I would hope that it would have a chilling effect on some of the cases that I don't think are appropriate under the Act. But, you know, Mr. Diamond – How will that weed out bad cases? Well, I think what it would do is it would discourage a law firm from making that their central business, filing the cases, and then trying to recover the attorney's fees. Mr. Diamond didn't, in this case, have an outside attorney. There were fees that were awarded, you know, initially until they took over. It was about $10,000 in fees that were accrued by an outside attorney. So, you know, there is – it doesn't prevent – it's not going to prevent, I don't think, cases because you can always have an outside attorney either on a contingency basis or, you know, pay fees. I think it's more typically a contingency fee basis. But I do think it would have a chilling effect on what we're seeing here in Illinois, which is – Why would there be these multiple federal court cases interpreting this really kind of against your position regarding the attorney fees? Well, I think those were very different contexts. How so? Well, I don't – I think those were situations – some of them were situations, I think,  And so I think to say, you know, that K, you know, they really say K doesn't say absolutely. You can't – you can't – this isn't a bar to collect an attorney's fees. But I think where, you know, in those cases that I looked at, there is a separate identity between the lawyers and the firm that I think isn't present in this case. What's the difference? In the cases that I read, and in this case, you've got a law firm, an entity, an artificial entity, that has lawyers who work within that doing battle for litigating, incurring fees, or, you know, at least keeping track of their fees. And then when it comes time to, you know, settle up, they file fee petitions. In all those cases, it wasn't a law firm with member lawyers. How is the identity different? Well, I think they're looking for an attorney-client relationship. I think they're trying to protect their being separate and distinct interests. Where here, I think Mr. Diamond admitted that the interests are aligned. The members of the firm are – it's relying on, you know, what they recover. So I think that they're trying to protect the importance of having representation and having that independent judgment that you get through hiring counsel. Anything else? Thank you. Okay. If you have no other questions, I'm done. Thank you very much, counsel. Thank you. Very interesting case. Thank you very much for your excellent presentation, both of you. We'll take the matter under advisement and stand adjourned. Thank you.